## In re CINCINNATI RADIATION LITIGATION.

### No. C-1-94-126.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 11, 1995.

David Kamp, Cincinnati, OH.

R. Joseph Parker, Cincinnati, OH.

## OPINION and ORDER

BECKWITH, District Judge.

The Complaint in this much-publicized matter alleges that the Defendants engaged in the design and implementation of experiments from 1960 to 1972 to study the effects of massive doses of radiation on human beings in preparation for a possible nuclear war. The experiments utilized terminal cancer patients who were not informed of the consequences of their participation nor, indeed, informed of the existence or purpose of the experiments. The Complaint alleges that most of the patients selected were African–American and, in the vernacular of the time, charity patients. The Complaint further alleges that the various Defendants actively concealed the nature, purpose and consequences of the experiments. The allegations of the Complaint make out an outrageous tale of government perfidy in dealing with some of its most vulnerable citizens. The allegations are inflammatory and compelling,

creating a milieu in which it is difficult to objectively examine the allegations for legal sufficiency or to apply a view of constitutional rights unilluminated by the legal evolution that has taken place since 1972 when the experiments at issue ended. The task is especially difficult in the constricted format afforded by Fed.R.Civ.P. 12(b)(1) and (6). The frequent lapses into factual disputes and arguments on all sides attest to the strong temptation to move beyond the four corners of Plaintiffs' Second Amended Complaint.

The Court has ignored all factual disputes in arriving at its respective conclusions. It has adhered to the foundational tenets provided by the case law as enunciated by the United States Supreme Court with little recourse to other precedents. The respective questions to be resolved are as follows: (1) Can the Plaintiffs prove any set of facts in support of their respective claims? (2) If so, as regards the Section 1983 claims, were the constitutional rights, which Plaintiffs allege were violated, clearly established at the time of the events at issue, so as to overcome the individual Defendants' claims of a qualified immunity defense. The answers to these questions determine the viability of Plaintiffs' various claims.

The discussion that follows will articulate the Court's analysis on each issue and subissue. In brief, however, the Court concludes that the Defendants have not established that the Plaintiffs can prove no set of facts that would support their claims under substantive due process, access to courts, procedural due process, equal protection, and Section 1985. Moreover, the Court is satisfied for the purposes of these motions that the contours of Plaintiffs' constitutional rights as regards those claims were sufficiently developed at the time of the events in question to afford a reasonable public official notice that the acts would likely violate Plaintiffs' constitutional rights.

The Court, therefore, will **DENY** the individual and *Bivens* Defendants' motions to dismiss as regards substantive due process, access to courts, procedural due process, equal protection, and Section 1985. However, the Plaintiffs' claims under an implied right of action and the Price–Anderson Act are **DISMISSED**. As a result of this ruling, the Plaintiffs' state law claims will remain pending in this Court pursuant to its supplemental jurisdiction.

Currently pending before the Court are motions to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) filed by all of the individual Defendants herein.[1] Pursuant to those motions, Defendants challenge the legal sufficiency of the Complaint[2], which is premised upon 42 United States Code ("U.S.C.") § 1983, arguing that the allegations fail to state a claim upon which relief may be granted and that they are immune from suit by reason of the defense of qualified immunity. Also pursuant to motions to dismiss, the Defendants contend that the Plaintiffs' Complaint fails to properly allege the elements of a claim under 42 U.S.C. § 1985 or the Price–Anderson Act, 42 U.S.C. § 2210(h)(2). Finally, the Defendants assert that because the federal claims pending against the individual Defendants must be dismissed, the resulting absence of federal claims mandates a dismissal of the remaining supplemental state claims against these individual Defendants pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

■ The Court's duty is to determine whether the Defendants are entitled to prevail on these motions based solely upon the factual allegations contained in the Complaint. These allegations, for purposes of the subject motions must, of course, be regarded as true. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983); *Lee v. West-*

1. Eugene L. Saenger, M.D.; Edward B. Silberstein, M.D.; Bernard S. Aron, M.D.; Harry Horwitz, M.D.; James G. Kereiakes, Ph.D.; Harold Perry, M.D.; Ben I. Friedman, M.D.; Thomas L. Wright, M.D.; I–Wen Chen, Ph.D.; Robert L. Kunkel, M.D.; Louis A. Gottschalk, M.D.; Theodore H. Wold, Ph.D.; Goldine C. Gleser, Ph.D.; Warren O. Kessler, M.D.; and Myron I. Varon,

M.D. A separate motion to dismiss the complaint was filed by the City of Cincinnati, and will be resolved shortly.

2. For the purposes of this Order, "Complaint" refers to the Plaintiffs' Second Amended Complaint, which was filed on October 11, 1994.

*ern Reserve Psychiatric Habilitation Center,*
747 F.2d 1062, 1065 (6th Cir.1984).

Each of the claims contained in the Complaint is broadly pleaded. To properly rule on the motions now before the Court, it is necessary to discuss the claims of the Plaintiffs [3] individually. Any attempt to resolve the issues raised by the motions demands an expansive discussion of those issues.

## I. *THE COMPLAINT*

To follow the path of analysis prescribed by Fed.R.Civ.P. 12(b)(6), the Court must look first to the allegations contained in the Complaint. The Court will then examine each issue raised by the Defendants through the lens created by the allegations contained in the Complaint.

An overview of the Complaint reveals that the Plaintiffs allege that they were the unwitting subjects of Human Radiation Experiments conducted at Cincinnati General Hospital ("CGH") between 1960 and 1972.[4] The Complaint alleges that the experiments were conducted under the auspices of the University of Cincinnati College of Medicine with funding and authorization from the United States Department of Defense's Nuclear Agency.[5]

Plaintiffs allege that the Human Radiation Experiments were designed to study the effects of radiation on combat troops. Consequently, Plaintiffs allege they were exposed to doses of radiation at levels to be expected on a nuclear battlefield.

It is also alleged that the subjects of the radiation experiments all had inoperable cancer and were told that they were receiving treatment for their cancer. Plaintiffs allege that they were in fact never told that they were part of a medical experiment or that they were receiving radiation in doses ranging from 25 to 300 rads as a means of providing the Defense Department information about the effects of radiation on military personnel in the event of a nuclear attack. Thus, the principal thrust of the Complaint is that none of the subjects gave informed consent to participate in the Human Radiation Experiments.

The Plaintiffs claim they were denied substantive due process, procedural due process, equal protection, and access to courts under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. The Plaintiffs also claim that the individual Defendants engaged in a conspiracy to deprive Plaintiffs of their constitutional rights and seek recovery under this theory pursuant to 42 U.S.C. §§ 1983 and 1985(3).

Finally, the Plaintiffs assert several Ohio common law claims including wrongful death, medical malpractice, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. Plaintiffs also assert that the Price–Anderson Act, 42 U.S.C. § 2210(h)(2) independently permits this Court to exercise jurisdiction over these state law claims.

The individual Defendants are denominated as follows: Eugene L. Saenger, M.D. was employed by the Department of Radiology of the University of Cincinnati College of Medicine and was the lead researcher conducting the Human Radiation Experiments at Cincinnati General Hospital. Dr. Saenger is alleged to have designed, supervised and conducted the experiments that are the subject of this Complaint.

Edward B. Silberstein, M.D.; Bernard S. Aron, M.D.; Harry Horwitz, M.D.; James G. Kereiakes, Ph.D.; Harold Perry, M.D.; Ben I. Friedman, M.D.; Thomas L. Wright, M.D.; I–Wen Chen, Ph.D.; Robert L. Kunkel,

---

3. The Plaintiffs are, for the most part, heirs and personal representatives of the patients who were the subjects of the experiments in question, because the patients are deceased. Discovery having been stayed pending the Court's decision on these motions, the Court cannot determine whether any of the original patients survive to pursue their potential claims. In any event, the Court will generically refer to the "Plaintiffs" without distinguishing the particular status of the various types of Plaintiffs.

4. Cincinnati General Hospital is now known as University Hospital. During the period in question, Cincinnati General Hospital was operated by the University of Cincinnati and was a municipal hospital. The University has since become a state institution.

5. Formerly the "Defense Atomic Support Agency".

M.D.; Louis A. Gottschalk, M.D.; Theodore H. Wold, Ph.D.; and Goldine C. Gleser, Ph.D. also were employed by the University of Cincinnati and are alleged to have assisted Dr. Saenger in the Human Radiation Experiments.

Warren O. Kessler, M.D., and Myron I. Varon, M.D., were medical officers in the United States Navy and are alleged to have been the Project Officers charged with providing federal oversight of the Human Radiation Experiments. Because Drs. Kessler and Varon were federal officials, their conduct will be examined along with that of the other individual Defendants under the doctrine of qualified immunity and as regards Section 1985 and the Price–Anderson statute. However, the claims against Drs. Kessler and Varon will also be analyzed separately under the *Bivens* doctrine, which specifically permits claims against federal employees who violate constitutional law.[6]

The City, a municipality in Hamilton County, Ohio, is also a Defendant. The Complaint alleges that the City sanctioned, funded, and actively participated in the Human Radiation Experiments.

Finally, the University of Cincinnati ("University"), including its constituent College of Medicine and University Hospital (formerly Cincinnati General Hospital) is also named as a Defendant. The University, now a state-owned academic and research institution, is located in Cincinnati, Ohio. During the time of the Human Radiation Experiments, the Defendant University and its constituents were owned and operated by the Defendant City. The University's Board of Directors are also alleged to have controlled and directed the Human Radiation Experiments.

### A. Factual Allegations

For purposes of the motions to dismiss, a detailed examination of the Complaint is necessary. Under the allegations of the Complaint, Plaintiffs tell the following story:

From 1960 to 1972 experiments were conducted at the University of Cincinnati College of Medicine and Cincinnati General Hospital on at least 87 people. (Complaint at ¶ 20). The subjects of the experiments were exposed to total or partial body irradiation. The primary purpose of the experiments was to test the psychological and physical effects of radiation on humans. (Complaint at ¶ 21). Indeed, a report prepared for the Department of Defense by the individual Defendants who conducted the Human Radiation Experiments during the period 1960 to 1966 indicated that the goal was "to develop a baseline for determining how much radiation exposure was too much, and to determine how shielding could decrease the deleterious effect of the radiation," and to determine what a single dose of whole or partial radiation could do to "cognitive or other functions mediated through the central nervous system." (Complaint, ¶¶ 23–25).

Patients were selected to be subjects in the experiments because they had cancer. The patients were not, however, in the final stages of their disease, nor were they close to death. Each patient selected was deemed in reasonably good clinical condition. Further, Dr. Saenger is alleged to have noted that the patients selected had life expectancies of up to two years. (Complaint at ¶ 26). Those patients selected were primarily indigent, poorly educated, and of lower than average intelligence. A majority of the patients selected were African–Americans. (Complaint at ¶ 28).

The patients selected for the experiments were told that they were receiving radiation for their cancer, although the radiation tests were designed to benefit the Human Radiation Experiments rather than the patients. (Complaint at ¶ 29). A 1961 report from the individual Defendants on the Human Radiation Experiments indicates that the patients were told that they were to receive treatment to help their sickness. (Complaint at ¶ 30).

No consent forms were used for the first five years of the Human Radiation Experiments. (Complaint at ¶ 31). Beginning in 1965, the Complaint alleges, consent forms were used but failed to state the real risk of

---

**6.** *Bivens v. Six Unknown Federal Officers,* 403 U.S. 388, 391, 91 S.Ct. 1999, 2002, 29 L.Ed.2d 619 (1971).

the radiation exposure to the patients. Further, the Complaint alleges that the consent forms did not indicate to the Plaintiffs that they were part of experiments funded by the Department of Defense or that the primary purpose of the experiments was to test the effect of radiation on soldiers in the event that they would encounter a nuclear attack. Rather, the consent forms indicated only that the patients were participating in scientific experiments. (Complaint ¶¶ 32–34). Thus, the Plaintiffs allege, all risks and hazards of the Human Radiation Experiments were not made known and, indeed, were intentionally concealed from the Plaintiffs. Specifically, none of the consent forms indicated that there was a risk of death from bone marrow infection within 40 days of irradiation. Likewise, none of the consent forms indicated that nausea and vomiting would likely be experienced by the subjects following irradiation. Finally, the long-term carcinogenic and genetic hazards associated with massive doses of radiation were also concealed. (Complaint at ¶ 34).

The Plaintiffs also allege that the subjects of the experiments were poorly educated and deemed to be of low intelligence, according to standardized tests. In light of the Plaintiffs' lack of sophistication, the Complaint alleges that the information provided by Defendants could not have been sufficient, in any event, to provide a basis for informed consent. In other words, voluntary and informed consent was impossible. (Complaint at ¶ 35).

Plaintiffs also allege that they did not have reason to know the true dangers of the Human Radiation Experiments to which they were subjected because of Defendants' purposeful concealment of information. Because of the purposeful concealment, the Plaintiffs had no reason to know of their possible claims for relief until approximately January 1994, when press reports identified a few of the subjects in the Human Radiation Experiments for the first time by name. (Complaint ¶¶ 36–39).

Radiation exposure from the Human Radiation Experiments either led to the patients' death, seriously shortened their life expectancies, and/or led to radiation injury resulting in bone marrow failure or suppression, nausea, vomiting, burns on the patients' bodies, severe and permanent pain, and/or suffering and emotional distress.

The Plaintiffs allege that the Human Radiation Experiments were designed and conducted by Defendant Saenger and the other individual Defendants with callous indifference to the effects such experiments would have on the physical and mental health of the subjects, and with conscious disregard for the rights and safety of the subjects in situations where there was a great probability of causing substantial harm. (Complaint at ¶ 41). The Human Radiation Experiments were also designed and conducted by Defendant Saenger and the other individual Defendants in direct contravention of the Helsinki Declaration Mandate regarding nontherapeutic clinical research. The Helsinki Declaration requires that the doctor "remain the protector of the life and health of that person on whom clinical research is being carried out." (Complaint at ¶ 42). Instead, the Human Radiation Experiments were conducted recklessly and willfully without due regard for the rights of the subjects of the research under the United States Constitution and laws, the laws of the State of Ohio, and international law.

### B. Legal Claims

Based upon the foregoing factual allegations, Plaintiffs set forth the following claims for relief:

(1) Plaintiffs' participation in the Human Radiation Experiments without informed consent resulted in a violation of their rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution, including, but not limited to, the right of access to the courts, the rights to procedural and substantive due process of law, the right to equal protection under the law, and the right to privacy under 42 U.S.C. § 1983.

(2) The federal Defendants, Drs. Kessler and Varon, have, under color of law, deprived Plaintiffs of rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution, including the right of access to the courts, the

rights to procedural and substantive due process of law, the right to equal protection under the law, and the right to privacy under *Bivens v. Six Unknown Federal Agents, supra.*

(3) By conspiring with each other to choose African–Americans as subjects for the Human Radiation Experiments, the Defendants violated 42 U.S.C. § 1985 and the United States Constitution.

(4) Pursuant to the Price–Anderson Act, 42 U.S.C. §§ 2011, *et seq.,* the Human Radiation Experiments conducted by Defendants constituted a series of "nuclear incidents," because such testing caused bodily injury, sickness, disease and/or death to Plaintiffs and their decedents. Thus, the Defendants are jointly liable for the injuries and damages described by the Complaint.

(5) The Defendants' program of nonconsensual Human Radiation Experiments constituted an abnormally dangerous activity, which caused harm to the Plaintiffs and for which they are strictly liable.

(6) Defendants University, City, and the individual Defendants committed medical malpractice by conducting the nonconsensual Human Radiation Experiments.

(7) The Defendants University and City, as well as the individual Defendants, acted negligently by authorizing, encouraging or carrying out the nonconsensual Human Radiation Experiments.

(8) As a result of the Defendants' negligent conduct, the Plaintiffs and/or their surviving family members have suffered severe emotional distress.

(9) The Defendants intentionally inflicted severe emotional distress by extreme and outrageous conduct, by conducting the nonconsensual Human Radiation Experiments.

(10) By intentionally exposing Plaintiffs or their decedents to harmful or fatal doses of radiation without informed consent, the Defendants committed a battery.

(11) By intentionally concealing from the Plaintiffs the full extent, potential consequences, and true purposes of the Human Radiation Experiments, the Defendants perpetrated a fraud upon Plaintiffs.

(12) Because the Secretary of Defense and Secretary of the Army both issued orders that prohibited the use of nonconsensual medical experiments, the Defendants violated an implied right of action.

## II. *BIVENS* ISSUES

### A. Personal Jurisdiction

■ Defendants Varon and Kessler ("*Bivens* Defendants") assert that because they lack minimum contacts with the State of Ohio, this Court lacks personal jurisdiction over them. Plaintiffs allege that the *Bivens* Defendants were responsible for ensuring that the Human Radiation Experiments were properly conducted. According to their allegations, the experiments took place in the State of Ohio over a twelve-year period. Plaintiffs also allege that the *Bivens* Defendants, like all Project Officers of the Human Radiation Experiments, had supervisory authority over the experiments. Finally, as the Plaintiffs articulate in their Complaint, the experiments caused tortious injury in the State of Ohio.

The Sixth Circuit Court of Appeals has determined that the State of Ohio's long-arm statute is coextensive with the limits of due process, *Creech v. Oral Roberts,* 908 F.2d 75 (6th Cir.1990). Under the limits of due process, personal jurisdiction can be exercised over a foreign defendant where the defendant's conduct constituted transacting business in the forum state. To make the determination that a defendant has sufficiently "transacted business" in a forum state, the Sixth Circuit has set forth a three-part test in *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374 (6th Cir.1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Plaintiffs allege that the Human Radiation Experiments were funded in significant part by a contract between the University of Cincinnati and the Department of Defense. Performance of that contract is alleged to have taken place exclusively within the State of Ohio. As Project Officers for the Department of Defense with supervisory responsibility over the Human Radiation Experiments, Defendants Varon and Kessler thus purposefully availed themselves of the privilege of acting in the State of Ohio. Further, the intentional act of entering into a contract with an Ohio resident meets the "purposeful availment" requirement. *See Wright International Express, Inc. v. Roger Dean Chevrolet, Inc.*, 689 F.Supp. 788, 790 (S.D.Ohio 1988).

The second part of the *Southern Machine* test asks whether the cause of action arose from the defendant's activities in the forum state. In this case, the contractual relationship between the government and the University is alleged to have resulted in a series of constitutional deprivations to the radiation subjects. Thus, there is a very close nexus between Dr. Varon's and Dr. Kessler's conduct and the causes of action asserted. *See In Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 229 (6th Cir.1972).

Finally, *Southern Machine* asks whether there is a sufficient enough connection with the forum state that the exercise of jurisdiction over the defendant is reasonable. The United States Supreme Court has equated the requirement of reasonableness with the "notions of fair play and substantial justice." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). Furthermore, in the *Wright International* case, the court indicated that when the first two prongs of *Southern Machine* are met, an inference arises that the third prong is satisfied. *See Wright International, supra*, 689 F.Supp. at 792. In light of the extensive contacts and the substantial impact that the *Bivens* Defendants had in Ohio, it is entirely reasonable that they should have anticipated being hailed into court in Ohio. Accordingly, the Court's exercise of personal jurisdiction over the Defendants comports with the requirements of due process under the United States Constitution. The Court concludes that it has personal jurisdiction over the *Bivens* Defendants.

## B. Supervisory Liability

■ Plaintiffs also allege that Drs. Varon and Kessler, as Project Officers for the Human Radiation Experiments in the Defense Atomic Support Agency and/or the Defense Nuclear Agency of the Department of Defense, were responsible for federal oversight of the experimentation program. Specifically, they were to ensure that the research design was sound and that risks to subjects were minimized. Further, Plaintiffs assert that the Project Officers acted in supervisory capacities by implicitly authorizing, approving, or knowingly acquiescing in the Human Radiation Experiments.

*Respondeat superior* does not apply in this claim. Rather, in order to establish the liability of the *Bivens* Defendants, a plaintiff must allege and prove that the supervisors in question condoned, encouraged, or knowingly acquiesced in the alleged misconduct. *See Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir.1993); *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir.1993). Defendants Varon and Kessler contend that Plaintiffs have not sufficiently alleged their supervisory liability. Specifically, the *Bivens* Defendants assert that Plaintiffs insufficiently pleaded their claim when they alleged that the *Bivens* Defendants "implicitly or explicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct which resulted in the deprivation of Plaintiffs' rights."

In *Nuclear Transport & Storage, Inc. v. United States*, 890 F.2d 1348, 1355 (6th Cir. 1989), *cert. denied*, 494 U.S. 1079, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990), the Sixth Circuit found that plaintiffs failed to sufficiently allege their *Bivens* claims, because they merely asserted that the officials "acted to implement, approve, carry out and otherwise facilitate the deprivation of Plaintiffs' rights". However, a review of the Complaint indicates that Plaintiffs have alleged Defendants Varon's and Kessler's supervisory liability beyond the conclusory allegations in *Nuclear Transport*. The Complaint alleges that De-

fendants Varon and Kessler were Project Officers for the Human Radiation Experiments in the Defense Atomic Support Agency and were charged with specific responsibility for ensuring that experiment designs were sound and that risks to subjects were minimized. (Complaint at ¶ 71). The Complaint further alleges that the Defendants implicitly or explicitly authorized or knowingly acquiesced in the Human Radiation Experiments.

A supervisor may be liable for violations of clearly established constitutional rights, even if the violations were directly carried out by others. *See, e.g., Hayes v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). The Plaintiffs have sufficiently alleged the *Bivens* Defendants' own wrongful conduct, as the Project Officers who authorized, approved, or acquiesced in the Human Radiation Experiments. The Plaintiffs are entitled to discover whether the *Bivens* Defendants were in fact supervisors of the Human Radiation Experiments. Accordingly, the *Bivens* Defendants' motion to dismiss is **DENIED.**

### III. *QUALIFIED IMMUNITY*

Section 1983, enacted in 1871, provides a right of action for parties deprived of their constitutional or federal statutory rights by actions taken "under color of state law." [7] Section 1983 thus holds public officials who violate an individual's rights under the Fourteenth Amendment liable for that violation.

▇▇▇ Most state officers who find themselves defending Section 1983 actions are entitled to raise the affirmative defense of qualified immunity. The defense, spurred in large measure by the rise of suits against public officials under Section 1983 is a judicially created doctrine. The text of Section 1983 does not suggest the availability of such a defense; rather, it derives from the com-

mon law doctrine of sovereign immunity, often stated as the maxim, "the king can do no wrong". *See Scheuer v. Rhodes,* 416 U.S. 232, 239–41, 94 S.Ct. 1683, 1687–88, 40 L.Ed.2d 90 (1974). The qualified immunity defense operates as an affirmative defense protecting officials from liability for any damages caused by their performance of discretionary functions. Importantly, the defense is not effective when plaintiffs can demonstrate that an official's conduct violated a plaintiff's clearly established statutory or constitutional rights.

The qualified immunity defense is designed to accommodate two conflicting public policy concerns. On the one hand, the Supreme Court recognizes the need to defend constitutional rights. At the same time, the Court has sought to protect public officials from suits for every error in judgment, thereby diverting their attention from their public duties, preventing them from independently exercising their discretion because of fear of damages liability, and discouraging qualified persons from seeking public office. *See Harlow v. Fitzgerald,* 457 U.S. 800, 813, 102 S.Ct. 2727, 2735–36, 73 L.Ed.2d 396 (1982); *Wood v. Strickland,* 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). In other words, the defense is a pragmatic compromise accommodating the conflicting goals of protecting individual rights and facilitating the "effective operation of government." Thus, officials are granted qualified immunity from suit for the benefit of society, not for the benefit of the individual official. *See Scheuer v. Rhodes,* 416 U.S. at 242, 94 S.Ct. at 1689.

▇▇▇ Courts are charged with the responsibility of ensuring that the defense of qualified immunity gives no more protection than is necessary for the official in question to effectively fulfill his duties. Each additional measure of protection afforded government officials inevitably divests individual citizens

---

7. 42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

of some remedies for violations of their constitutional rights.

Before 1982, the controlling precedent on qualified immunity, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), set out a two-part standard for determining whether immunity applied to a particular situation. Under *Strickland* an official

> [was] not immune from liability for damages under § 1983 if (1) he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [individual] affected, or (2) if he took the action with a malicious intention to cause a deprivation of constitutional rights or other injury....

*Id.* at 322, 95 S.Ct. at 1001. The first standard is known as the objective test while the second is referred to as the subjective test.

With its opinion in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court ushered in a new era for the qualified immunity defense. In *Harlow,* the Court dramatically changed the law of qualified immunity by removing the subjective test. Writing for the Court, Justice Powell reiterated the reasons for cloaking public officials with qualified immunity:

> In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.... At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2nd Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

*Id.* at 814, 102 S.Ct. at 2736. The Court held that allegations of malice were no longer sufficient to defeat a claim of qualified immu-

nity. Rather, government officials performing discretionary functions were shielded from liability for civil damages so long as the officials' conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 818, 102 S.Ct. at 2738.

Shortly following *Harlow,* the Court reaffirmed its commitment to a strictly objective test. In *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Court indicated that

> *Harlow v. Fitzgerald* rejected the inquiry into state of mind in favor of a wholly objective standard.... Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of [his] conduct as measured by reference to clearly established law. No other circumstances are relevant to the issue of qualified immunity.

*Id.* at 191, 104 S.Ct. at 3017.

■ Thus, before the commencement of discovery, a defendant asserting qualified immunity is entitled to dismissal if the plaintiff fails to state a claim alleging the violation of clearly established law. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). It is the district court's duty to determine the currently applicable law *and* whether that law was clearly established at the time of the alleged conduct. *See Daugherty v. Campbell,* 935 F.2d 780 (6th Cir.1991) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). If the law was not clearly established, it is impossible for the district court to find that the defendant knew that the law forbade his or her conduct. *Id.*

The task of determining what makes a right "clearly established" for purposes of qualified immunity has been accurately labeled a "labyrinth". *See Long v. Norris,* 929 F.2d 1111, 1114 (6th Cir.1991). Initially, district courts were asked to discern whether a "legitimate question" of law existed. In *Mitchell v. Forsyth, supra,* the Court held that the constitutional prohibition against warrantless wiretaps was not clearly established if there remained a "legitimate question whether an exception to the warrant requirement exists." *Mitchell,* 472 U.S. at

533, 105 S.Ct. at 2819. A "legitimate question" existed in *Mitchell* because at the time the questioned wiretaps were authorized, some district courts had approved warrantless wiretaps in cases of domestic security. *See Long,* 929 F.2d at 1114. The Court did not explain when an official would have a "legitimate question" as to.the constitutionality of his or her action. However, the *Mitchell* Court did indicate that a previous case with "identical circumstances was not needed to find that a law was clearly established." *Long,* 929 F.2d at 1114 (citing *Mitchell,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12). Nevertheless, the standard was often as confusing as the issues courts were asked to examine.

In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court clarified the legitimate question issue and specifically held that in order for a constitutional right to be clearly established

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; ... but it is, to say that in light of preexisting law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citations omitted). This "objective reasonableness" standard focuses on whether defendants reasonably could have thought that their actions were consistent with the rights that plaintiffs claim were violated. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988) (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039).[8]

In determining whether a constitutional right is clearly established, this Court must look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit Court of Appeals and other courts within the Sixth Circuit, and finally to decisions of other circuits. *See Daugherty,* 935 F.2d at 784.

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its Court of Appeals or itself. In an extraordinary case, it may be possible for the decisions. of other courts to clearly establish a principle of law. For the decisions of other courts. to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Ser. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988). Thus, only in extraordinary cases may this Court look beyond Supreme Court and Sixth Circuit precedent to find "clearly established law."[9]

The analysis and application of the qualified immunity defense in this case first requires a threshold determination. The Court must initially consider whether the Plaintiffs have asserted a violation of a constitutional right at all. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In this regard, the individual Defendants' and *Bivens* Defendants' motions to dismiss on the basis of qualified immunity also serve as arguments that the Complaint fails to allege the deprivation of a constitutional right.

If the Plaintiffs do assert a valid constitutional claim, the Court must then make an additional two-step inquiry into the sufficiency of the Complaint. First, the Court must determine whether the. constitutional rights alleged to have been violated were clearly established at the time of the alleged Human

---

8. For example, in *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990), Judge Posner observed

> [t]here has never been a Section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability.

9. After *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1992) ("A court engaging in review of qualified immunity should use its full knowledge of its own and other relevant precedents...."), it is unclear whether *Seiter* remains controlling authority. For purposes of this Order, the Court assumes that *Seiter* remains .binding.

Radiation Experiments. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *see also Poe v. Haydon,* 853 F.2d 418, 423 (6th Cir.1988).

The second inquiry is inextricably intertwined with the first. The Court must examine the allegations of the Complaint that relate to the alleged misconduct of the defendant officials; in the context of a motion to dismiss, the Court must accept these allegations as true. The Court must then ask and answer the following question: Would a reasonable official in defendant's position have known that what defendant did, as expressed in the allegations, violated plaintiffs' clearly established rights? If, upon the conclusion of this analysis, Plaintiffs have failed to allege sufficient facts to withstand the qualified immunity defense, this Court will grant the motions to dismiss. *See Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987).

## IV. DUE PROCESS

### A. Right to Bodily Integrity

 The first step in deciding whether the individual and *Bivens* Defendants are entitled to qualified immunity is to determine whether the Constitution, through the Fourteenth Amendment's substantive due process component, protects an individual from nonconsensual invasive medical experimentation by state actors. Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. *See Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). To state a cause of action under Section 1983 for violation of the Due Process Clause, Plaintiffs must show that they have asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law. *See Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). The Supreme Court has expanded the definition of "liberty" beyond the core textual meaning of that term to include not only the privileges expressly enumerated by the Bill of Rights but also the fundamental rights implicit in the

concept of ordered liberty, deeply rooted in this nation's history and tradition under the Due Process Clause. *See, generally, Bowers v. Hardwick,* 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1982); *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977).

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive a person of life, liberty, or property without due process of law." The Supreme Court has noted

> [a]lthough a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, at least since *Mugler v. Kansas,* 123 U.S. 623 [8 S.Ct. 273, 31 L.Ed. 205] in 1887, the Clause has been understood to contain a substantive component as well....

*Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992).

*See also Pierson v. City of Grand Blanc,* 961 F.2d 1211, 1216 (6th Cir.1992); *Braley v. City of Pontiac,* 906 F.2d 220, 224 (6th Cir. 1990). This substantive component of the Due Process Clause 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.' *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (citing *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).

 The Plaintiffs' substantive due process claim in this case is grounded upon the premise that individuals have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment, and particularly upon the premise that nonconsensual experiments involving extremely high doses of radiation, designed and supervised by military doctors and carried out by City hospital physicians violate that right.

 The right to be free of state-sponsored invasion of a person's bodily integrity

is protected by the Fourteenth Amendment guarantee of due process. In *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), Chief Justice Rehnquist, writing for the Court, specifically noted that "the protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, *and the right to bodily integrity.*" Citing *Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) (emphasis added). The allegations set forth in Plaintiffs' Second Amended Complaint are sufficient to bring the Plaintiffs' claims within the purview of that right.

■■■ As a threshold matter, the individual and *Bivens* Defendants raise the issue of voluntariness. Voluntariness pertains to this case on two levels. First is the question of whether the Plaintiffs were voluntary patients at Cincinnati General Hospital, and if so, what effect that voluntary presence has on their ability to assert this claim. Second, the Court must determine whether the Plaintiffs in this case sufficiently allege that they were involuntary participants in the Human Radiation Experiments, and, if so, what effect that involuntary participation has on their ability to assert this claim.

Many of the cases recognizing constitutional causes of action for nonconsensual medical treatment involve plaintiffs who were either prisoners or were involuntarily committed to psychiatric institutions. In their various memoranda and at oral argument, the Defendants argue that Plaintiffs were voluntarily present at Cincinnati General Hospital when the Human Radiation Experiments were performed. The Defendants argue that all of the Plaintiffs came to the hospital of their own volition and could have left the hospital at any time they chose. Since the liberty interest at issue has only been extended to prison inmates and patients involuntarily confined in psychiatric institutions, the Defendants argue that Plaintiffs cannot base their cause of action on this liberty interest. In support of this contention, the Defendants point specifically to *Rogers v. Okin,* 478

F.Supp. 1342 (D.Mass.1979), *aff'd. in part, rev'd. in part,* 634 F.2d 650 (1st Cir.1980), *vacated and remanded sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

In *Rogers,* a class action was brought on behalf of both voluntary and involuntary patients at a state institution for the mentally ill. The plaintiffs' basic grievance was that the defendants who served on the hospital staff maintained policies of forced medication and involuntary seclusion in nonemergency circumstances. *Id.* at 1352. The plaintiffs sought both monetary damages and injunctive relief. The district court held that both voluntary and involuntary patients had a constitutional right to make the "intimate decisions as to whether to accept or refuse psychotropic medication." *Id.* at 1366.

On review, the First Circuit Court of Appeals accepted the district court's reasoning only as it applied to involuntarily committed patients. The Court of Appeals held that "voluntary patients have no constitutionally protected right to refuse unwanted drugs because voluntary patients could simply leave the hospital if they did not want to be drugged. Voluntary patients can be forced to choose between leaving the hospital and accepting prescribed treatment." *Id.* at 661.[10] Thus, the Defendants argue that because Plaintiffs in this case "carried the key to the hospital exit" they chose to accept radiation treatment as a matter of free will and cannot claim that their liberty was in any way curtailed.

This argument fails at this stage of the litigation for several reasons. First, it is not at all clear that Plaintiffs were voluntary patients at Cincinnati General Hospital. The Plaintiffs in this case are all alleged to have been poor. Discovery may demonstrate that the only hospital in the city to treat indigent patients was Cincinnati General Hospital. If this is so, the Court would be reluctant to hold that a person with only one hospital from which to choose voluntarily enters that hospital when he becomes ill. Regardless of

---

**10.** Plaintiffs also cite an Eleventh Circuit case in which that court arrived at a similar conclusion.

See *Doe v. Public Health Trust of Dade County,* 696 F.2d 901, 903 (11 Cir.1983).

that factual uncertainty, Defendants argument still fails for the following reasons.

The Plaintiffs allege that they were purposefully misled in several respects. First, Plaintiffs allege that they were specifically not informed that the radiation they were receiving was for a military experiment rather than treatment of their cancer. Further, Plaintiffs allege that they were never informed that the amount of radiation they were to receive would cause burns, vomiting, nausea, bone marrow failure, severe shortening of life expectancy, or even death. When a person is purposefully misled about such crucial facts as these, he can no longer be said to exercise that degree of free will that is essential to the notion of voluntariness.

> To manipulate men, to propel them toward goals which we see but they may not, is to deny their human essence, to treat them as objects without wills of their own, and therefore to degrade them. This is why to lie to men, or to deceive them, that is, to use them as means for our not their own, independently conceived ends, even if it is to their own benefit, is, in effect to treat them as sub-human, to behave as if their ends are less ultimate and sacred than our own. . . . For if the essence of men is that they are autonomous beings—authors of values, of ends in themselves . . .—then nothing is worse than to treat them as if they were not autonomous but natural objects whose choices can be manipulated.[11]

Defendants assert that if Plaintiffs did not like what was being done to them they could have left the hospital at any time. Unfortunately for Plaintiffs, however, they allegedly never possessed knowledge sufficient to make that choice. The allegations in the Complaint indicate that the choice Plaintiffs would have been forced to make was one of life or death. If the Constitution protects "personal autonomy in making certain types of important decisions," *Whelan v. Roe, infra,* at 589, the decision whether to participate in the Human Radiation Experiments was one that each individual Plaintiff was entitled to make freely and with full knowledge of the purpose and attendant circumstances involved. Without actually seizing the Plaintiffs and forcing them to submit to these experiments, the individual and *Bivens* Defendants, agents of the state, accomplished the same feat through canard and deception, according to the allegations of the Complaint.

In 1990, the Supreme Court unequivocally held that the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper,* 494 U.S. 210, 229, 110 S.Ct. 1028, 1041, 108 L.Ed.2d 178 (1990). Still, other cases support the recognition of a general liberty interest in refusing medical treatment. *Riggens v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (forced administration of antipsychotic medication during trial violated Fourteenth Amendment); *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1991) (government has duty to protect involuntarily committed mental patients from physical assault); *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (surgical intrusion into attempted robbery suspect's chest to recover bullet without compelling need unreasonable under Fourth Amendment where surgery would place suspect at risk of adverse side effects); *Vitek v. Jones,* 445 U.S. 480, 494, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (transfer to mental hospital coupled with mandatory behavior modification treatment implicated liberty interests); *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment"); *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (Constitution protects personal autonomy "in making certain types of important decisions"); *Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) ("The integrity of the individual person is a cherished value of our society"); *Rochin v. California,* 342 U.S. 165, 171, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (the forcible extraction of stomach contents shocks conscience and violates due process). *See also Cruzan v. Director, Missouri De-*

---

11. Isaiah Berlin, FOUR ESSAYS ON LIBERTY 136–37 (1969).

*partment of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1989) (Fourteenth Amendment has been held to include medical decision-making, reflecting the "principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment.")

■ Determining that a person has a "liberty interest" under the Due Process Clause does not end the inquiry; whether a person's constitutional rights have been violated must be determined by balancing his liberty interest against the relevant state interests. *Youngberg v. Romeo,* 457 U.S. at 321, 102 S.Ct. at 2461. *See also Mills v. Rogers,* 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982). Indeed, compulsory vaccinations,[12] compelled blood tests[13] and extractions of contraband material from the rectal cavity[14] have sometimes been upheld on a showing of clear necessity, procedural regularity, and minimal pain. However, each of these cases has acknowledged that an aspect of fundamental liberty was at stake and that the government's burden was to provide more than minimal justification for its action. For example, while upholding the compulsory blood test in *Schmerber,* Justice Brennan emphasized the narrowness of the Court's holding:

> It bears repeating … that we reach this judgment only on the facts of the present record. The integrity of the individual's person is a cherished value of our society. That we hold today that the Constitution does not forbid the state's minor intrusions into an individual's body under strictly limited conditions in no way indicates that it permits more substantial intrusions or intrusions under other conditions.

*Id.* at 772, 86 S.Ct. at 1836. These several cases indicate that in order to maintain an action under the Fifth Amendment, it is sufficient that a plaintiff demonstrate that an invasion of bodily integrity was deficient in procedural regularity, or that it was needlessly severe.

■ When an individual's bodily integrity is at stake, a determination that the state has accorded adequate procedural protection should not be made lightly. Since bodily invasions often cannot be readily remedied after the fact through damage awards in the way that most deprivations of property can, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (state remedy provides due process where no immunity bars tort suit for prison mail clerk's negligent loss of prisoner's mail-order hobby kit), the state must precede any deliberate invasion with formalized procedures. This is precisely what the Supreme Court held in *Washington v. Harper,* 494 U.S. at 210, 110 S.Ct. at 1030–31. In *Washington,* the Supreme Court held that the extent of a prisoner's right under the Due Process Clause to avoid the unwanted administration of an antipsychotic drug had to be defined within the context of the inmate's confinement. *Id.* at 215, 110 S.Ct. at 1033. At issue was a policy that required the state to establish by medical finding a mental disorder that was likely to cause harm to the prisoner or inmate community if it was not treated by antipsychotic medication. *Id.* at 211, 110 S.Ct. at 1031. Upholding the policy, and thus the nonconsensual administration of the drug, the Court emphasized that the policy at issue required both a prescription by a physician and a review by an objective outside physician to ensure that the treatment would be ordered only if it was in the prisoner's medical interest, given the legitimate needs of his confinement. *Id.* at 216, 110 S.Ct. at 1033–34. It was the procedural structure surrounding the nonconsensual administration of the medication that kept the state-sponsored invasion of bodily integrity within the boundaries of due process.

---

**12.** *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (compulsory vaccinations for smallpox upheld over religious objection).

**13.** *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood tests of auto accident victim for alcoholic content conducted in hospital held reasonable).

**14.** Compare *Revas v. United States,* 368 F.2d 703 (9th Cir.1966) *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967) (border search of male rectum upheld); with *Huguez v. U.S.,* 406 F.2d 366 (9th Cir.1968) (institution of forced border search of rectum under nonmedical conditions violated Fifth Amendment guarantee of humane treatment).

In applying the criterion of needless severity, the crucial factors are the presence of physical pain, the permanence of any disfigurement or ensuing complication, the risk of irreversible injury to health, and the danger to life itself. *See Schmerber*, 384 U.S. at 772, 86 S.Ct. at 1836–37. However, an intrusion otherwise sufficiently minimal to pass this test is, nevertheless, beyond the boundaries of due process if less severe means could achieve the state's purpose with the same effectiveness. For example, the Supreme Court has unanimously held that compelling a suspect to submit to the surgical removal under general anesthesia of a bullet that authorities believed would link him to a crime violated the Constitution if the state already possessed substantial, independent evidence of the origin of the bullet. *See Winston v. Lee*, 470 U.S. at 764, 105 S.Ct. at 1618.

The allegations in the Complaint indicate that procedural regularity was absent and that the invasion of bodily integrity was severe. In essence, the allegations in the Complaint amount to a claim that the individual Defendants blatantly lied to the Plaintiffs. Unlike in *Washington v. Harper*, a decision was not made by the treating physician that Plaintiffs' medical condition required drastic doses of radiation. Rather, the allegations give rise to the question of whether Plaintiffs were receiving medical treatment at all. This absence of procedural safeguards alone is sufficient to trigger the protections of the Due Process Clause. However, the allegations contained even more.

The allegations also indicate that the Plaintiffs received needlessly severe invasions of their bodily integrity. Unlike in *Schmerber*, where the invasion was minimal and had no lasting side effects, the invasion Plaintiffs allege in this case was total and partial body radiation, which caused burns, vomiting, diarrhea and bone marrow failure, and resulted in death or severe shortening of life. These allegations are more than sufficient to trigger Fifth Amendment protection.

Thus, in accord with *Barrett v. United States*, 798 F.2d 565 (2nd Cir.1986),[15] the Court is compelled to hold that the individual and *Bivens* Defendants may not assert the defense of qualified immunity. The qualified immunity defense is reserved to those officials who are sued for their exercise of discretionary responsibilities delegated to them by the government. There can be no doubt that the individual and *Bivens* Defendants' alleged instigation of and participation in the Human Radiation Experiments were acts far beyond the scope of their delegated powers. The individual and *Bivens* Defendants, many of whom were physicians, were not acting as physicians when they conducted experiments on unwitting subjects at Cincinnati General Hospital. Rather, the Defendants were acting as scientists interested in nothing more than assembling cold data for use by the Department of Defense. While many government officials are authorized to conduct research, the individual and *Bivens* Defendants were hired by the City to care for the sick and injured. The Constitution never authorizes government officials, regardless of their specific responsibilities, to arbitrarily deprive ordinary citizens of liberty and life.

Nevertheless, the Court will consider both prongs of the qualified immunity defense. First, the preceding analysis accepts, for purposes of this motion, the facts in the Complaint detailing state-sponsored experiments involving procedural due process irregularity, severe pain and death, and purposeful deception. These allegations are more than adequate to state a cause of action under the Due Process Clause of the Fourteenth Amendment.

## B. Clearly Established Law

The Court must next determine whether the conduct alleged by Plaintiffs was clearly unconstitutional when the Human Radiation Experiments were performed. As the Court indicated previously, the right that Plaintiffs assert must have been sufficiently clear dur-

---

**15.** *Barrett* involved a Plaintiff who had been the unwitting subject of a state-sponsored experiment with a mind altering drug. The experiment occurred in 1953, and when the Second Circuit Court of Appeals finally heard the case in 1986, the Court held that by sanctioning the experimental use of a deadly drug, the defendant officials were not exercising powers delegated to them by the government. *Barrett* is both factually and legally analogous to the instant case.

ing the period between 1960 and 1972 that a reasonable official would have understood that his actions violated that right. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. In order to gauge the clarity with which the claimed right has been established, this Court must look to the binding precedent of the Supreme Court, the Sixth Circuit Court of Appeals, and the District Court for the Southern District of Ohio. Due to the span of time between the acts alleged and the filing of this case, the Court is required to determine the state of the law three decades ago. Even more difficult is the fact that at this juncture of qualified immunity analysis, the Court is only concerned with the law as it stood between 1960 and 1972. If the Court concludes that a reasonable official would have known that the alleged conduct was unconstitutional—even if the analysis of that violation has changed in the ensuing decades—the Court will deny the individual and *Bivens* Defendants' qualified immunity defense on this claim.

The conduct attributed to the individual and *Bivens* Defendants—all representatives of government—strikes at the very core of the Constitution. Even absent the abundant case law that has developed on this point since the passage of the Bill of Rights, the Court would not hesitate to declare that a reasonable government official must have known that by instigating and participating in the experimental administration of high doses of radiation on unwitting subjects, he would have been acting in violation of those rights. Simply put, the legal tradition of this country and the plain language of the Constitution must lead a reasonable person to the conclusion that government officials may not arbitrarily deprive unwitting citizens of their liberty and their lives.

If the Constitution were held to permit the acts alleged in this case, the document would be revealed to contain a gaping hole. This is so in part because the alleged conduct is so outrageous in and of itself, and also because a constitution inadequate to deal with such outrageous conduct would be too feeble in

method and doctrine to deal with a very great amount of equally outrageous activity. Indeed, virtually all of the rights that we as a nation hold sacred would be subject to the arbitrary whim of government.

Respect for an individual's right to bodily integrity is central to American constitutional history and tradition. The Constitution's Framers were heavily influenced by the enlightened views of popular sovereignty and limited government. For John Locke, the ideological father of the American Revolution, liberty was freedom from restraint, and the exercise of coercive power by the sovereign was always suspect. The function of the law, in Locke's view, was to protect individual liberty from restraint by government or others. A central principle in Locke's thinking was the essential need for

> a certain minimum area of personal freedom which must on no account be violated; for if it is overstepped, the individual will find himself in an area too narrow for even that minimum development of his natural faculties which alone make it possible to pursue, and even to conceive, the various ends which men hold good or right, or sacred.[16]

Indeed, this principle was reflected by Thomas Jefferson in the Declaration of Independence.[17]

An individual's autonomy was, thus, the primary value in revolutionary idealism that led to colonial independence. Then, when the first ten amendments to the Constitution were ratified in 1791, six amendments made clear that the newly created national government was a government of limited authority. Our entire history has been a continuous effort to safeguard that concept of ordered liberty. Respect for individual autonomy by the government is a central principle within that ideal.

These principles of individual autonomy and liberty were absorbed into American legal theory and the doctrine of substantive due process. As indicated previously, while the common law understanding of the term

---

**16.** Isaiah Berlin, FOUR ESSAYS ON LIBERTY 124 (1969).

**17.** Garrett W. Sheldon, THE POLITICAL PHILOSOPHY OF THOMAS JEFFERSON, 9, 12 (1991).

"liberty" within the due process clause was initially limited to freedom from physical restraint, this concept has gradually expanded to include a variety of personal liberties. *See, e.g., Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.E. 1042 (1923). In *Meyer,* the Supreme Court noted

> [w]hile this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399, 43 S.Ct. at 626.

The Supreme Court has since construed the Due Process Clause of the Fourteenth Amendment not only to incorporate virtually all of the specific provisions of the Bill of Rights, but also to protect liberty interests not specifically enumerated in the Constitution itself. The Court has expressed the view that the Framers believed the full scope of the liberty guaranteed by the Due Process Clause could not be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. Rather, in a constitution for free people, the meaning of liberty must be broad. *See Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (1972). For example, in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court, in striking down the state's statutory ban on the sale of contraceptives, found a right of privacy grounded in several constitutional provisions that protected the marital relationship. Later, in *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349

(1972), the Supreme Court indicated that its holding in *Griswold* involved individual autonomy rather than merely deference to the marital relationship. In *Eisenstadt,* the Court held that a statute permitting distribution of contraceptives to married, but not to unmarried, persons was unconstitutional. *Id.* at 453, 92 S.Ct. at 1038. The Court stated that "if the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusions into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

Like other constitutionally protected autonomy rights, the right to self-determination in matters of personal health is deeply rooted in our constitutional tradition. The right is an outgrowth of the "historic liberty interests in personal security and bodily integrity." [18]

The common law origins of the right of the individual to exercise control over health care decisions have also been recognized throughout this country's history. Almost 80 years ago, Justice Cardozo, then a Judge serving on the New York Court of Appeals, memorialized the right to make personal health decisions: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages." *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92, 93 (1914). Case law developing the informed consent doctrine as a device to protect patients' rights to refuse treatment is also grounded in the common law's deference to individual autonomy:

> Anglo–American law starts with the premise of thorough-going self-determination. It follows that each man is considered to be master of his own body and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment. A doctor might well believe that an operation or form of treat-

---

**18.** See *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977) (noting that "among the historic liberties so protected was a right to be free from ... unjustified intrusions on personal security"); *Union Pacific Railroad Company v. Botsford,* 141 U.S. 250, 252, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891).

ment is desirable or necessary, but the law does not permit him to substitute his own judgment for that of the patient.

*Natanson v. Klein,* 186 Kan. 393, 350 P.2d 1093, 1104 (1960).

Tort law has embraced this basic principle of informed consent in order to guard a patient's control over decisions affecting his or her own health. *See Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261, 269, 110 S.Ct. 2841, 2846–47, 111 L.Ed.2d 224 (1990). Under the tort construct, absent an emergency or incompetency, the individual must voluntarily consent before medical treatment may be administered, and the physician is required to provide sufficient information so that the consent is informed. It is patently clear that the premise of the informed consent doctrine is the "concept, fundamental in American jurisprudence, that the individual may control what shall be done with his own body." *Canterbury v. Spence,* 464 F.2d 772, 780 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

Because of this historical protection by state tort law, the individual Defendants attempt to describe this case as one of "simple medical malpractice" or "an ordinary tort case" in order to circumvent Plaintiffs' Section 1983 claims. The individual and *Bivens* Defendants' argument is without merit, and the argument reveals an interpretation of the Constitution that would vitiate the fundamental constitutional principles just described. The distinction between this case and an ordinary tort case in not one of degree, but rather, of kind.

Government actors in cases such as this violate a different kind of duty from that owed by a private tort defendant. Individuals in our society are largely left free to pursue their own ends without regard for others, save a general duty not to harm others by negligent conduct. This is the "ordinary" tort case. The relationship between government and the individual is fundamentally different. In a free society, government is neither an autonomous actor nor a master to whom the people must acquiesce. The function of government is to serve the people and to enhance the quality of life.

The broad purpose of all constitutional limits on government power is to ensure that government does not stray from that role or abuse its power.

As the Court indicated previously, the contours of the right to be free from unwanted bodily intrusions has been developed over a long line of cases. As early as 1884, the Supreme Court recognized that the liberty right of the Fourteenth Amendment protected the integrity of one's body. *See Hurtado v. People of California,* 110 U.S. 516, 536, 4 S.Ct. 111, 121, 28 L.Ed. 232 (1884). In 1891, the Supreme Court explicitly stated that "no right is more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others unless by clear and unquestionable authority of law." *Union Pacific Railroad Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). Still other cases expanded the scope of the notion of liberty. *See, e.g., Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

In *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Supreme Court struck down a statute that mandated the sterilization of habitual criminals convicted of crimes of moral turpitude. Although the Supreme Court's analysis was couched in equal protection terms, the Court nevertheless observed that the invasive medical procedure of sterilization performed without the consent of the patient, "forever deprived [the individual] of a basic liberty." *Id.* at 541, 62 S.Ct. at 1113.

Finally, in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court made clear that "our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination." *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261, 287, 110 S.Ct. 2841, 2856, 111 L.Ed.2d 224 (O'Connor, J. concurring). In *Rochin,* a defendant in a narcotics case swallowed a number of cap-

sules when he was confronted by the police. After unsuccessfully attempting to retrieve the capsules by hand, the police forcibly extricated the capsules from the defendant's stomach. *Rochin,* 342 U.S. at 166, 72 S.Ct. at 206–07.

The Supreme Court, reversing the defendant's criminal conviction, held that the government's conduct in obtaining the capsules violated the Due Process Clause. Due process was denied, according to Justice Frankfurter, who wrote for the Court, because the forced stomach pumping "offended those canons of decency and fairness which expressed the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Id.* at 169, 72 S.Ct. at 208. In a phrase that has endured as a shorthand for the holding, Justice Frankfurter then went on to add that the government's conduct "shocked the conscience." *Id.*

The analogy between *Rochin* and this case is clear. In *Rochin,* the Court sent an unmistakable message to government officials that needlessly severe intrusions of an individual's body, *even if that individual was a felon and stripped of most of his liberty,* were impermissible under the Due Process Clause of the Constitution. Simply put, *Rochin* was the red flag that the individual and *Bivens* Defendants in this case failed to heed as they allegedly selected unwitting cancer patients to be the subjects of the Human Radiation Experiments: experiments were conducted on ordinary citizens, and the doses of radiation amounted to severe invasions of bodily integrity.

In their effort to limit the force of the *Rochin* holding, the individual Defendants first assert that *Rochin* no longer has the force of controlling law. However, while the *Rochin* analysis has been limited by the Supreme Court in *Graham v. Conner,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (claims arising from police use of excessive force incident to an arrest or investigatory stop are most properly construed as invoking the protections of the Fourth Amendment, not the Due Process Clause), the Supreme Court, as recently as 1992, indicated that the central holding of *Rochin* remains undisturbed. *See Collins v. City of Harker Heights,* 503 U.S. 115, 126–27, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992) (quoting the *Rochin* standard as a test of constitutionality under the Due Process Clause). Nevertheless, even if *Rochin* has been questioned in the years since it was decided, *Rochin was the prevailing law during the Human Radiation Experiments; it is sufficient precedent for purposes of this qualified immunity analysis.*

The individual and *Bivens* Defendants also contend that *Rochin's* "shock the conscience" standard was simply too vague to clearly indicate to reasonable government officials between 1960 and 1972 that their alleged conduct was unconstitutional. In essence, the Defendants argue that "the contours of the rights were not sufficiently clear." *See Anderson, supra,* at 640, 107 S.Ct. at 3039. Again, the individual and *Bivens* Defendants are mistaken.

The *Rochin* case falls easily into the line of cases addressing state-sponsored invasions of bodily integrity. This Court concludes that between 1960 and 1972 the right to due process as enunciated in *Rochin* was sufficiently clear to lead a reasonable government official to the conclusion that forcing unwitting subjects to receive massive doses of radiation was a violation of due process.

In 1905, the Supreme Court upheld compulsory vaccinations for smallpox. In *Jacobson v. Massachusetts,* 197 U.S. at 29, 25 S.Ct. at 362–63, the Court first acknowledged the existence of "a sphere within which the individual may assert the supremacy of his own will" against governmental interference. *Id.* Recognizing that the state's police power interests in legislating to protect the public health, safety, and welfare could justify interfering with the individual's sphere of autonomy, the Court held that the minimal invasion of a vaccination coupled with the state's need to prevent a smallpox epidemic were sufficient to overcome the individual's liberty interest. Importantly, the Court suggested that the results in the case would have been different if the vaccination would have seriously impaired the petitioner's health. *Id.*[19]

---

**19.** Compare *Schmerber v. California,* 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908

Likewise, in *Schmerber · v. California*, 384 U.S. at 757, 86 S.Ct. at 1829, the Supreme Court held that compelled blood tests for alcohol content of an automobile accident victim in a hospital were reasonable because of the minimal intrusion involved and the lack of permanent effect. However, as noted previously, the court in *Schmerber* carefully limited the contours of the holding:

> It bears repeating ... that we reach this judgment only on the facts of the present record. *The integrity of the individual's person is a cherished value of our society.* That we hold today that the Constitution does not forbid the state's minor intrusions into an individual's body under strictly limited conditions in no way indicates that it permits more substantial intrusions or intrusions under other conditions.

*Id.* at 772, 86 S.Ct. at 1836. (emphasis added).

Thus, in the context of this case, *Schmerber,* and *Jacobson* before it, can be cited as the boundaries of the right to bodily integrity expressed in *Rochin.* While *Jacobson* and *Schmerber* involved minimally invasive procedures with no lasting side effects, the procedures in *Skinner* and *Rochin* were extremely invasive and produced lasting side effects. Certainly, a reasonable official who must conform his conduct to Supreme Court precedent for purposes of qualified immunity would realize that an invasion of bodily integrity by government officials resulting in death of the subjects would have been actionable under *Rochin.*

In the Human Radiation Experiments, it is alleged that the individual and *Bivens* Defendants designed and implemented experiments to study the effect of massive doses of radiation on military personnel during a nuclear war. To facilitate their experiments, the individual and *Bivens* Defendants are alleged to have targeted low income and African–American cancer patients from Cincinnati General Hospital. Plaintiffs allege that the Defendants did not even explain to their decedents that experiments were being conducted, what the purposes of the experiments were, or that the high doses of radiation could result in their death, shorten their lives substantially, or cause burns, nausea, vomiting, or bone marrow failure.

The invasions of bodily integrity alleged in this case are *more* extreme than those at issue in either *Skinner* or *Rochin.* Unlike the cases of *Jacobson* and *Schmerber,* the invasion of bodily integrity alleged to have occurred in this case had extreme consequences, among them the most permanent of all possible consequences. Thus, had this set of facts come before this Court in 1972, the Court would have found that Plaintiffs had stated a valid claim under the Due Process Clause of the Constitution. The right at issue and its contours were sufficiently well-defined by the Supreme Court prior to 1972 such. that the individual and *Bivens* Defendants should have known that their conduct would violate the Constitution.

### C. The Nuremberg Code

The preceding demonstrates that the constitutional law controlling the invasion of an individual's bodily integrity was clearly established between 1960 and 1972. Indeed, the prevailing law detailing the right was sufficiently clear that a reasonable official would have known that the Human Radiation Experiments violated constitutional law. Accordingly, that law provides an independent basis for the Plaintiffs' Section 1983 action. Nevertheless, it is impossible for the Court to ignore the historical context in which the Human Radiation Experiments were conducted.

After World War II, the United States and its allies were involved in a succession of criminal trials. The trials have commonly become known as the Nuremberg trials. Perhaps the best known Nuremberg trial involved the military officers of the Third Reich. The doctors' trial, *United States of America v. Carl Brandt, et al.,* I Trials of War Criminals, Vol. 11 at 181 (1949); 6

(1966) (finding compulsory blood test of suspected intoxicated driver to be "routine" and to involve "virtually no risk, trauma, or pain" and thus constitutional) with *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)

(forcibly extracting narcotics from individual's stomach "shocks conscience"). *See also Botsford, supra* (plaintiff could not be compelled to submit to surgical examination).

F.R.D. 305 (1949), also known as the "Medical Case", was tried at the Palace of Justice in postwar Nuremberg, Germany. The trial was conducted under U.S. military auspices according to the Moscow Declaration on German Atrocities (November 1, 1943), Executive Order 9547 (May 2, 1945), and the London Agreement (August 8, 1945).

The judges appointed by President Truman to hear the Medical Case were all American judges and lawyers: Walter Beals, a justice from the Washington Supreme Court; Harold Sebring, a Florida Supreme Court Justice; Johnson Crawford, a judge from the Oklahoma District Court; and Victor Swearingen, an assistant attorney general of the State of Michigan. The case was prosecuted by then Supreme Court Justice Robert Jackson, and a military lawyer, Telford Taylor.

The Nuremberg tribunal was asked to determine the culpability of twenty-three (23) German physicians under "the principles of the law of nations as they result from the usages established among civilized peoples, from the laws of humanity, and from the dictates of public conscience." Id. at 181. The charges against the physicians included human experimentation involving nonconsenting prisoners. The experiments included studies of the limits of human tolerance to high altitudes and freezing temperatures. Medically-related experiments included inoculation of prisoners with infectious disease pathogens and tests of new antibiotics. Various experiments involving the mutilation of bone, muscle and nerve were also performed on nonconsenting prisoner subjects.

Throughout the trial, the question of what were or should be the universal standards for justifying human experimentation recurred. "The lack of a universally accepted principle for carrying out human experimentation was the central issue pressed by the defendant physicians throughout their testimony." [20]

The final judgment of the court was delivered on July 19, 1947. The judgment has since become known as the "Nuremberg Code." The first provision of the Code states as follows:

*The voluntary consent of the human subject is absolutely essential.* This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health and person which may possibly come from his participation in the experiment.

The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs, or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.[21]

**20.** The Nazi doctors and the Nuremberg Code, Human rights in human experimentation 132–133 (George J. Annas & Michael A. Grodin eds., 1992). A few of the ethical arguments presented by the defendants during the trial as justification for their participation in the experimentation programs are summarized as follows:

(1) Research is necessary in times of national emergency. Military and civilian survival may depend on the scientific and medical knowledge derived from human experimentation. Extreme circumstances demand extreme action.
(2) There were no universal standards of research ethics.

(3) The state determined the necessity for the human experimentation. The physicians were merely following orders.
(4) Sometimes it is necessary to tolerate a lesser evil, the killing of some, to achieve a greater good, the saving of many.
(5) The prisoners' consent to participation in human experimentation was tacit. Since there were no statements that the subjects did not consent, it should be assumed that valid consent existed.
Id. at 133.

**21.** *United States of America v. Brandt* (the Medical Case), II Trials of War Criminals Before The Nuremberg Military Tribunals Under Control Council Law No. 10, p. 181 (1949).

Only five years later, in recognition of these principles, the Secretary of Defense directed that human experimentation for the Department of Defense could only be conducted where there was full and voluntary consent of the subject. The directive issued by the Secretary of Defense is a mirror of the Nuremberg Code. *See Memorandum For The Secretary of the Army, Navy, Air Force, February 26, 1953.* In 1954, the World Medical Association adopted five general principles for those engaged in research and experimentation. Also in the mid-1950's, the Clinical Center of the National Institutes of Health ("NIH") adopted guidelines that applied to the use of human subjects in experimental medical research. The NIH Guidelines state:

> The rigid safeguards observed at NIH are based on the so-called "ten commandments" of human medical research which were adopted at the Nuremberg War Crimes Trials after the atrocities performed by Nazi doctors had been exposed. Every subject must give his full consent to any test, and he must be told exactly what it involves so that he goes into it with his eyes open. Among other things, the experiment must be designed to yield "fruitful results for the good of society," unnecessary "physical and mental suffering and injury" must be avoided, the test must be conducted by "scientifically qualified" persons, and the subject must be free to end it at any time he feels unable to go on.[22]

Finally, in 1962, the federal government became more formally involved in the regulation of research. The Drug Amendments Act of 1962 was enacted to keep unsafe or useless drugs off the market by requiring proof of safety and efficacy from the drug companies. In the wake of the thalidomide experience, Congress noted that no state required physicians to inform patients that an experimental drug was being used on them. As a result, the final version of the 1962 law contained a provision that required "experts using such drugs for investigational purposes" to inform persons to whom they are to be administered that they are being given drugs for investigational purposes and to obtain the consent of these individuals or their representatives, except "where they deem it not feasible, or in their professional judgment, contrary to the best interest of such human beings." *See Federal Food, Drug and Cosmetic Act,* Section 505(i), 1962.

 The Nuremberg Code is part of the law of humanity. It may be applied in both civil and criminal cases by the federal courts in the United States.[23] At the very least, by the time the Human Radiation Experiments were designed, the Nuremberg Code served as a tangible example of conduct that "shocked the conscience," as contemplated in *Rochin, supra. Rochin* came only five years after the Nuremberg trials. Certainly Justice Frankfurter and the other members of the Court were influenced by the state-sponsored atrocities delineated in the Medical Case. Thus, even were the Nuremberg Code not afforded precedential weight in the courts of the United States, it cannot be readily dismissed from its proper context in this case. The individual and *Bivens* Defendants, as physicians and other health professionals, must have been aware of the Nuremberg Code, the Hippocratic Oath, and the several pronouncements by both world and American medical organizations adopting the Nuremberg Code. It is inconceivable to the Court that the individual and *Bivens* Defen-

22. *See NIH, "Handbook On The Utilization of Normal Volunteers In The Clinical Center,"* Section 3.06, (1961) p. 10.

23. *See United States v. Stanley,* 483 U.S. 669, 710, 107 S.Ct. 3054, 3066, 97 L.Ed.2d 550 (1987) (O'Connor, J. dissenting). In *Stanley,* the Army administered LSD to an unwitting enlisted man. Under the *Feres* doctrine, the Supreme Court held that Mr. Stanley could not obtain money damages from the military for his involvement in the experiment. Writing for a five-four Court, Justice Scalia expressed concern that permitting an enlisted man to sue the Army "would call into serious question military discipline and decision-making." In her forceful dissent, Justice O'Connor relied on the Nuremberg Code for the proposition that due process guarantees the subjects of human experiments the right to voluntary and informed consent. Because Plaintiffs in this case are not military personnel, the Court is convinced that Justice O'Connor's dissent in *Stanley* controls. *See also Whitlock v. Duke University,* 637 F.Supp. 1463 (M.D.N.C.1986); *Kaimowitz v. Mich. Dept. Mental Health,* No. 73–19434–AW (Mich.Cir.Ct. Wayne Co., July 10, 1973).

dants, when allegedly planning to perform radiation experiments on unwitting subjects, were not moved to pause or rethink their procedures in light of the forceful dictates of the Nuremberg Tribunal and the several medical organizations.

The allegations in this case indicate that the government of the United States, aided by officials of the City of Cincinnati, treated at least eighty-seven (87) of its citizens as though they were laboratory animals. If the Constitution has not clearly established a right under which these Plaintiffs may attempt to prove their case, then a gaping hole in that document has been exposed. The subject of experimentation who has not volunteered is merely an object. The Plaintiffs in this case must be afforded at least the opportunity to present their case. As Justice O'Connor indicated in her dissent from *United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987),

> [t]he United States military played an instrumental role in the criminal prosecution of Nazi officials who experimented with human beings during the Second World War ... and the standards that the Nuremberg Military Tribunals developed to judge the behavior of the defendants stated that the voluntary consent of the human subject is absolutely essential ... to satisfy moral, ethical, and legal concepts.... If this principle is violated, the very least society can do is to see that the victims are compensated, as best they can be, by the perpetrators. I am prepared to say that our Constitution's promise of due process of law guarantees this much.

*Id.* at 710, 107 S.Ct. at 3066.

The doctrine of qualified immunity does not insulate the individual and *Bivens* Defendants from liability for their deliberate and calculated exposure of cancer patients to harmful medical experimentation without their informed consent. No judicially-crafted rule insulates from examination the state-sponsored involuntary and unknowing human

experimentation alleged to have occurred in this case. Accordingly, the individual and *Bivens* Defendants' motion to dismiss the substantive due process claim is **DENIED**.[24]

## V. THE SUBSTANTIVE RIGHT OF ACCESS TO COURTS AND PROCEDURAL DUE PROCESS

Asserting that the Defendants' concealment of the true purpose and potentially harmful effects of the Human Radiation Experiments substantially compromised their ability to obtain relief, Plaintiffs claim both substantive and procedural deprivations of constitutional rights.

As with the Court's analysis of Plaintiffs' substantive due process claims, here the Court must first determine whether the Plaintiffs have alleged the violation of a constitutional right under current law and, if so, determine whether the constitutional right was clearly established at the time of the alleged conduct.

### A. The Substantive Right of Access to Courts

The right of access to courts is basic to our system of government, and is one of the fundamental rights protected by the Constitution. In *Chambers v. Baltimore & Ohio Railroad*, 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907), the Supreme Court characterized this right of access in the following terms:

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

---

**24.** The Plaintiffs assert a substantive due process claim under the right to be free from nonconsensual invasions of bodily integrity and, in the alternative, the right to privacy. In the preceding analysis, the Court has determined that a cause of action is appropriate under the right to bodily integrity. Thus, the Court will not analyze the plaintiffs' assertion that a right to privacy creates a viable cause of action.

207 U.S. at 148, 28 S.Ct. at 35. Thus, as far back as 1907, the Supreme Court viewed the right of access to the courts as one of the privileges and immunities accorded citizens under Article Four of the Constitution and the Fourteenth Amendment.

An additional constitutional basis for the right of access to the Courts is found in the Due Process Clause of the Fourteenth Amendment. In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court defined the right of access in a civil rights action under Section 1983 as one assuring that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. *Id.* at 558, 94 S.Ct. at 2975–76.

The Sixth Circuit Court of Appeals has also made clear that the right of access to the courts is a fundamental right found in the Due Process Clause. *See Graham v. National Collegiate Athletic Ass'n*, 804 F.2d 953, 959 (6th Cir.1986). The Sixth Circuit has specifically held that interference with or deprivation of the right of access to the courts is actionable under Section 1983. *Id.* at 959. To be actionable, the claim need not allege a total or complete denial of access to the courts. Rather, plaintiffs need only claim that "the interference with and potential prejudice to the right of access to redress in state court rises to the level of a constitutional deprivation." *See Fisher v. City of Cincinnati*, 753 F.Supp. 681, 687 (S.D.Ohio 1990). Thus, a constitutional violation of the right of access has occurred when

> [s]tate officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled.

*Crowder v. Sinyard*, 884 F.2d 804, 812 (5th Cir.1989) (citing *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir.1983)).

In the Complaint, Plaintiffs claim that the individual Defendants intentionally did not explain the experiments' true nature and the risks for their subjects. Additionally, Plaintiffs claim that the individual Defendants failed to tell the patients that they were the subjects of experiments, funded by the Department of Defense, to study the effects of radiation on human beings in the event of a nuclear attack. Finally, Plaintiffs assert that the individual Defendants continued to conceal this information from Plaintiffs until press reports revealed the existence of the Human Radiation Experiments in 1994 and identified the names of some subjects of the Human Radiation Experiments.

The individual and *Bivens* Defendants contend that Plaintiffs' claim fails because the Sixth Circuit Court of Appeals explicitly and unequivocally held that fraudulent concealment claims, such as those made by Plaintiffs in this litigation, could not form the basis of a Section 1983 access to the courts claim. *See Joyce v. Mavromatis*, 783 F.2d 56 (6th Cir. 1986).

The individual and *Bivens* Defendants' reliance on *Joyce* is misplaced. In *Joyce,* the plaintiff alleged that two police chiefs destroyed relevant evidence, altered police reports and otherwise covered up the role of the son of one of the police chiefs in an automobile accident injuring the plaintiff. *Id.* at 57. The plaintiff brought a Section 1983 action against the police chiefs and others for their conduct, alleging that her access to state courts had been abridged in violation of her procedural due process, equal protection and First Amendment rights. *Id.* The Sixth Circuit Court of Appeals held that the Plaintiff's due process claim failed because there was no allegation that the state's judicial process did not provide fair procedures that would remedy the wrong alleged. In other words, the Court of Appeals determined that the plaintiff still could have had the "day in court" to which she was entitled. The plaintiff's equal protection claim failed because she did not allege that conduct was directed toward her as a member of a "suspect class." Finally, the plaintiff's First Amendment claim based on the right of access to courts failed because she had the right to file her damage suit under Ohio law

and to offer proof about the accident and the alleged destruction of relevant evidence.

The *Joyce* plaintiff's complaint was filed relatively soon after the conduct in question occurred. In this case, Plaintiffs did not learn of the individual Defendants' conduct until early 1994, between twenty-two (22) and thirty-four (34) years after the conduct and alleged coverup took place. As stated above, Plaintiffs need not show that Defendants conduct completely denied Plaintiffs access to the courts and thereby deprived them of their causes of action. It is sufficient that Plaintiffs allege that the Defendants' conduct seriously compromised their access and their causes of action. Moreover, assuming that the Defendants' conduct has seriously compromised Plaintiffs' causes of action, then no court process can sufficiently remedy the damage done to Plaintiffs.

Indeed, the facts in this case are analogous to those in *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir.1983). In *Ryland*, allegations of conduct by prosecutors in falsifying a death certificate and in covering up a murder for a period of 11 months were held to state a claim for deprivation of a claimant's right of access to the courts:

> Conduct by state officers which results in delay in the prosecution of an action in state court may cause such prejudice.... Delay haunts the administration of justice. It postpones the rectification of wrong and the vindication of the unjustly accused. It crowds the dockets of the courts, increasing the costs for all litigants, pressuring judges to disposition of those causes in which all parties are diligent.... But even these are not the worst of what delay does. The most erratic gear in the justice machinery is at the place of fact finding, and possibilities for error multiply rapidly as time elapses between the original fact and its judicial determination.

*Id.* at 974.

The Court finds it sufficient that Plaintiffs allege that their claims have been substantially compromised by the individual Defendants' conduct in concealing the true purpose

and dangers associated with the Human Radiation Experiments. In the 20 to 30 years since the Human Radiation Experiments, crucial evidence may have been lost, many witnesses may have died or otherwise have become unavailable, and certainly many witnesses' memories have faded.

When the Human Radiation Experiments were conducted, the Plaintiffs' right of access to the courts was clearly established under the Fourteenth Amendment's Due Process Clause as well as the First Amendment's right to petition for redress of grievances. *See Chambers, supra,* at 148, 28 S.Ct. at 35; *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969);[25] *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Brinkerhoff–Ferris Trust & Savings Co. v. Hill,* 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). Consequently, the Court finds that the Plaintiffs' constitutional right of access to the courts was clearly established at the time of the alleged misconduct so that a reasonable official should have known whether or not his conduct violated the law.

For the reasons set forth above, the individual and *Bivens* Defendants' motion to dismiss Plaintiffs' access to courts claim is **DENIED.**

## B. Procedural Due Process

◼ As indicated above, the Complaint may also be construed to allege a deprivation of the Plaintiffs' right to procedural due process under the Fourteenth Amendment. The Court's analysis must begin with the inquiry whether the Plaintiffs possess an interest protected by the Due Process Clause of the Fourteenth Amendment. The Plaintiffs claim that they have been deprived of property without due process. In this instance, the Plaintiffs assert that the property right they have lost is their ability to pursue a wrongful death claim under Ohio law. The

---

**25.** The Court notes that only recently, Judge Nixon, of the United States District Court for the Middle District of Tennessee, reached a similar conclusion in *Craft v. Vanderbilt University, et al.,* No. 3:94–0090.

Supreme Court has long held that "the hallmark [of] property . . . is an individual entitlement grounded in state law, which cannot be removed except for cause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). *See also Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Specifically, the United States Supreme Court has recognized that a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause. *See Logan, supra,* at 428, 102 S.Ct. at 1153–54. In fact, the Supreme Court, as far back as 1882, held that a "vested right of action is properly in the same sense in which tangible things are property, and is equally protected from arbitrary interference." *Pritchard v. Norton,* 106 U.S. 124, 132, 1 S.Ct. 102, 108, 27 L.Ed. 104 (1882). Because a cause of action is a species of property protected by the Fourteenth Amendment, any state action that substantially interferes with an individual's claims or precludes his or her opportunity to be heard, violates procedural due process. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1988); *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Barrett v. United States,* 689 F.2d 324 (2nd Cir.1982).

▇ In the Complaint, Plaintiffs allege that all of their claims have been substantially compromised by the conduct of the individual Defendants in concealing from Plaintiffs the true purpose and dangers of the Human Radiation Experiments. Plaintiffs allege that they have completely lost their ability to pursue a wrongful death claim. Plaintiffs

assert that crucial evidence has been lost, including the subjects of the experiments themselves who may have witnessed the consent procedures, and also the percipient witnesses.[26]

As was the case with Plaintiffs' access to courts claim, the Court finds that Plaintiffs have sufficiently alleged that their claims have been substantially compromised by the individual Defendants' conduct in concealing the true purpose and dangers associated with the Human Radiation Experiments. Likewise, as far back as 1882, the Supreme Court established that a cause of action is protected under the Due Process Clause. *See Pritchard,* 106 U.S. at 132, 1 S.Ct. at 107–08; *Gibbs v. Zimmerman,* 290 U.S. 326, 54 S.Ct. 140, 78 L.Ed. 342 (1933); *Fidelity & Deposit Co. of Maryland v. Arenz,* 290 U.S. 66, 54 S.Ct. 16, 78 L.Ed. 176 (1933).[27] Accordingly, the Court finds that these constitutional rights were clearly established at the time of the alleged conduct so that a reasonable official would have known that his conduct violated the law. In light of the preceding analysis, the individual and *Bivens* Defendants' motion to dismiss the Plaintiffs' procedural due process claim is **DENIED.**

## VI. IMPLIED RIGHT OF ACTION

Plaintiffs' twelfth claim for relief asserts that an implied right of action emanates from a directive on the "use of human volunteers in experimental research" by the Secretary of Defense dated February 26, 1953. Plaintiffs assert that, because the directive has the force and effect of law, there are two separate and independent bases from which Plaintiffs can state a claim for damages. First, Plaintiffs assert that because the 1953

---

26. Indeed, as Defendants indicate in their brief, an action for wrongful death must be commenced within two years after the decedent's death. Ohio Revised Code Section 2125.02(d). The Ohio Supreme Court has determined that this two-year rule applies even if the defendant prevented the plaintiff from prosecuting the action through fraudulent concealment. See *Shover v. Cortiz Corp.,* 61 Ohio St.3d 213, 219, 574 N.E.2d 457, 462 (1991), *reh'g. denied,* 62 Ohio St.3d 1410, 577 N.E.2d 362 (1991). Defendants unwittingly assist plaintiffs in their cause. The fact that the Ohio wrongful death statute does not permit the plaintiffs to prosecute their action in light of fraudulent concealment, eliminates

Plaintiffs' burden of proving that the state's judicial process does not provide fair procedures which would remedy the wrong alleged if proved. See *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Vicory v. Walton,* 721 F.2d 1062 (6th Cir.1983). With regard to the wrongful death claim, the Plaintiffs' only remaining avenue for redress of its grievances is through the Due Process Clause of the Fourteenth Amendment and Section 1983.

27. See also *Barrett v. United States,* 798 F.2d 565 (2nd Cir.1986).

directive is the equivalent of a federal law, its violation can be redressed by a claim under Section 1983. Second, Plaintiffs argue that under the test set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the directive creates an implied right of action. An examination of each of Plaintiffs' assertions regarding these bases for an implied cause of action reveals that neither is sufficient to withstand the individual and *Bivens* Defendants' motions to dismiss. Accordingly, Plaintiff's twelfth claim for relief is **DISMISSED.**

■ Plaintiffs' first basis for relief under this claim is the proposition that the Secretary of Defense's directive had the force and effect of law. In support of that contention, Plaintiffs argue that the authority of the President to issue rules and regulations relating to the military has been clearly established for most of this country's history. Further, Plaintiffs assert that as recently as 1988 the Supreme Court actually rejected the notion that an explicit grant of congressional authority to the President was necessary before the President could issue regulations governing the military that had the force and effect of law. *See Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).[28]

Next, Plaintiffs assert that Congress itself has conferred upon the Secretary of Defense sweeping authority to issue directives such as the 1953 directive that have the force and effect of law. In support of this contention, Plaintiffs cite 5 U.S.C. § 301 in which Congress enacted the following provision for "departmental regulations:"

> The head of an executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers and property.

Plaintiffs assert that this statute makes clear that the regulatory authority of the Secretary of Defense extends to "orders, regulations, and other actions relating to the military establishment." Finally, Plaintiffs assert that their argument is bolstered by the fact that 5 U.S.C. § 301 [29] is cited as the statutory basis for the current defense department policy on human experimentation found at 32 C.F.R. §§ 219.101., *et seq.*, (1991).

The individual and *Bivens* Defendants on the other hand assert that the constitutional authority vested in the President of the United States and Section 301 are not sufficient to give the 1953 directive the force and effect of law. First, the individual and *Bivens* Defendants point to *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), for the proposition that while the President is the Commander-in-Chief, his power under Article 2, Section 2 of the Constitution grants him no legislative authority. Next, the individual and *Bivens* Defendants assert that Section 301 is merely a housekeeping statute that does not extend substantive rights. In support of this contention, the individual Defendants cite *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979), in which the Supreme Court held that the Department of Labor regulations regarding record disclosure did not have the "force and effect of law." In *Chrysler*, the car company attempted to rely on Section 301 in order to block certain disclosures made by the Department of Labor. *Id.* In its holding, the Court emphasized that Section 301 was merely the current version of statutes in place since the beginning of the republic, and was designed to give the heads of departments authority to cover internal departmental affairs. *Id.* at 310, 99 S.Ct. at 1721–22. The Court then described Section 301 as a "housekeeping statute" that merely authorized rules of agency organization, procedure and practice, as opposed to "substantive rules." *Id.* Thus, Defendants assert, Section 301 cannot supply the necessary congressional authorization to make defense department regulations into laws that extend

---

**28.** The *Egan* case arose in the context of the right to classify national security information and to determine who would have access to classified information. *Id.* at 530–533.

**29.** Now cited as 5 U.S.C. § 22.

jurisdiction to federal courts. The Court agrees.

There simply is no nexus between the 1953 directive issued by the Secretary of the Army and a corresponding delegation of legislative authority by the United States Congress. *See Chrysler,* 441 U.S. at 304, 99 S.Ct. at 1718–19. Plaintiffs assert that the Secretary of Defense did not need to cite any specific statutory authority because he derived his authority from the President's Commander-in-Chief powers. However, as *Youngstown, supra,* demonstrates, the President's Commander-in-Chief powers do not extend so far. Thus, while the 1953 directive had the effect of governing Defense Department personnel, it cannot be considered as having the force and effect of law for the purposes of this litigation.

 Plaintiffs next contend that the 1953 directive contains an implied right of action within the framework of *Cort v. Ash, supra.* In *Cort,* the Supreme Court set forth a four-part test controlling when an implied right of action may arise. First, is the plaintiff one for whose benefit the directive was enacted? Second, was the intent of the drafter, whether explicit or implicit, to create or deny a private remedy? Third, would implying such a remedy be inconsistent with the underlying purposes of the directive? Finally, is the cause of action one traditionally relegated to state law? *See Cort v. Ash,* 442 U.S. at 78, 95 S.Ct. at 2141–42.[30]

Cases subsequent to *Cort* have explained that the ultimate issue is whether Congress intended to create a private right of action. Nevertheless, the four factors specified in *Cort* remain the "criteria through which this intent could be discerned." *See California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). Congressional intent is determined principally by looking at the text of the statute and then by looking at the legislative history and utilizing other standard tools of statutory interpretation. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622–23, 69

L.Ed.2d 435 (1981); *AFSCME Local 506 v. Private Industry Council,* 942 F.2d 376 (6th Cir.1991) (no implied private right of action under the Job Training Partnership Act subsection protecting regular employees from being displaced by program participants).

Plaintiffs assert that because the 1953 directive is in essence the Nuremberg Code, the directive obviously was created for the benefit of Plaintiffs as the subjects of Human Radiation Experiments. Next, Plaintiffs assert that there is no indication that the Secretary of Defense intended to deny a remedy to Plaintiffs. However, in *Utley v. Varian Associates, Inc.,* 811 F.2d 1279 (9th Cir.1987), the circuit court held that the presence of detailed enforcement procedures created a strong presumption that the executive deliberately omitted a private remedy from an executive order. *Id.* at 1286. In contrast, Plaintiffs assert that in this case the lack of a particularized enforcement mechanism in the military directive at issue indicates a desire to make private remedies available. This is simply a leap of logic that the Court will not make. The directive issued by the Secretary of Defense gives a clear indication that no private remedy was ever intended by the drafter. Indeed, paragraph 5 of the directive states that "the addressees will be responsible for ensuring compliance with the provisions of this memorandum within their respective services." The language of the directive thus indicates that enforcement of its provision was given over to the Secretaries of the Armed Forces branches and that it was not intended to extend any right to these Plaintiffs to sue the individual or *Bivens* Defendants for damages in federal court. Finally, Plaintiffs cannot point to any congressional intent to support the private cause of action they assert. That fact alone vitiates Plaintiffs' attempt to create an implied right of action under the *Cort* scheme. *See Texas Industries, Inc. v. Radcliffe Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981).

 Plaintiffs next argue that the 1953 directive independently permits them to

---

30. The President simply does not make laws; neither does the Secretary of Defense. "The President may not circumvent the Constitution by attempting to legislate by executive order." *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. at 579, 72 S.Ct. at 863.

bring an action pursuant to Section 1983. Since the Court has not accepted that the 1953 directive has the force and effect of federal law, it follows that the directive cannot be considered a "law" for Section 1983 purposes. The Secretary's directive does not create a liberty interest that Plaintiffs may assert for Section 1983 purposes. In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Court indicated that regulations "may create a liberty interest protected by the Due Process Clause." *Id.* at 469, 103 S.Ct. at 870. Yet, decisions of the executive branch, however serious their impact, do not invoke due process protection. *See Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Thus, while the Secretary of Defense's directive does contain language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, the directive is more appropriately treated as an internal departmental memo under the rubric of *Washington v. Starke,* 855 F.2d 346 (6th Cir.1988) (substantive right not clearly established by interdepartmental memo). Accordingly, the 1953 directive does not create a liberty interest sufficient to bring it within the purview of Section 1983 analysis. Therefore, Plaintiffs' twelfth claim for relief is **DISMISSED.**

## VII. EQUAL PROTECTION

Plaintiffs have made a Section 1983 claim alleging that they have been denied equal protection of the laws under the Fourteenth Amendment of the Constitution. Unlike their defenses to Plaintiffs' other Section 1983 claims, the individual Defendants do not assert that the law of equal protection was not clearly established during the period of the Human Radiation Experiments. Rather, the individual Defendants argue that Plaintiffs have failed to adequately state an equal protection claim and thus move for a dismissal of that claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

 The Constitution guarantees that no state shall deprive any person "the equal protection of the laws." The Equal Protec-

tion Clause is in essence a direction that all persons similarly situated should be treated alike. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3253–54, 87 L.Ed.2d 313 (1985). If an official acts with the intent to discriminate and his act disparately impacts a protected class, such as a racial minority, the act violates the Equal Protection Clause. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

 Plaintiffs allege that the Human Radiation Experiments were directed predominantly at African–Americans. (Comp. ¶ 57(B)). Plaintiffs also allege that the individual Defendants intentionally discriminated against them by purposefully targeting African–Americans as subjects. (Comp. ¶ 65). In an inartful passage of their Complaint, Plaintiffs assert that the disparity between the racial composition of the general population of patients at General Hospital vis-a-vis patients selected for the Human Radiation Experiments demonstrates that one purpose of the experiments was to subject African–Americans to high levels of radiation.

 It is well-settled that facially neutral official acts can be administered in such a discriminatory fashion as to violate the Equal Protection Clause. *See Washington, supra,* 426 U.S. at 239, 96 S.Ct. at 2047. *See also Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272, 1280–81, 51 L.Ed.2d 498 (1977) (substantial exclusion of Mexican–Americans from grand jury sufficient to state an equal protection claim); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1885) (ordinance requiring license to construct wood laundry administered in such a way as to prevent Chinese applicants from receiving licenses violated Equal Protection Clause). Plaintiffs in this action assert that like *Castaneda* and *Yick Wo,* the facially neutral Human Radiation Experiments were administered in such a way as to intentionally discriminate against African–Americans.

 Disparate impact alone is not sufficient to state a valid equal protection claim. In *Washington v. Davis, supra,* and in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252,

97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court indicated that evidence of intent in addition to disparate impact (where the disparate impact was not extreme) was necessary to state an equal protection claim. To satisfy this additional pleading requirement, Plaintiffs assert that the predominance of African–Americans in the Human Radiation Experiments was not coincidental. Rather, Plaintiffs assert that African–American cancer patients were purposefully targeted as subjects for the Human Radiation Experiments. That allegation of intent, Plaintiffs contend, is sufficient to meet the pleading requirements of *Washington* and *Arlington Heights*.

The individual Defendants, on the other hand, contend that the Court need not examine the disparity in racial composition of the subject groups of the Human Radiation Experiments because Plaintiffs have failed to meet the threshold requirement that similarly situated persons were treated differently. Indeed, at oral argument, liaison counsel for the individual Defendants argued that the similarly situated persons at issue are the subjects of the Human Radiation Experiments. Thus, counsel contended, the Plaintiffs must demonstrate that African–American subjects were treated differently from the Caucasian subjects of the Human Radiation Experiments. Defense counsel's universe is simply too small. Plaintiffs allege that when the individual Defendants determined who would become subjects in the Human Radiation Experiments, they did so with racial animus. Obviously, then, the similarly situated group at issue is that universe of people from which the individual Defendants could have chosen their subjects. This fact reveals in part why the Court does not today dismiss the Plaintiffs' equal protection claim. The record in this case must be developed in order to determine what the universe of patients was and whether the racial composition of that group was similar to the

racial composition of the subjects of the Human Radiation Experiments. The question of racial animus is also a fact-intensive question.[31]

The individual Defendants also contend that Plaintiffs' allegations of intent are not sufficient to meet pleading requirements under the Equal Protection Clause. In support of their contention, the individual Defendants rely on *Chapman v. Detroit*, 808 F.2d 459 (6th Cir.1986). According to the individual Defendants, in *Chapman*, the Court of Appeals for the Sixth Circuit followed its "routine" of upholding the dismissal of an equal protection claim where only general allegations of intent existed.

In *Chapman*, a group of Detroit firefighters challenged the City's charter provision that forced firefighters to retire at age 60. The complaint alleged that the City had not strictly enforced that provision. The complaint went on to claim that by not strictly enforcing the provision, the defendant City violated plaintiffs' equal protection rights. The plaintiffs' case was dismissed, and, on appeal, the Sixth Circuit upheld the constitutionality of the retirement provision and observed that the complaint failed to allege any facts regarding the administration of the retirement law. *Id.* at 465 (citing *Blackburn v. Fiske University*, 443 F.2d 121 (6th Cir. 1971)).

Unlike the plaintiffs in *Chapman*, the Plaintiffs in this case allege facts in support of their equal protection claim. In *Chapman*, the plaintiffs' basic pleading failure was to omit facts demonstrating that the administration of the retirement policy predominantly disadvantaged minority firefighters. Here, Plaintiffs have pleaded that the subjects in the Human Radiation Experiments were predominantly African–American, and that the subjects for the experiments were chosen as a result of racial ani-

---

**31.** Indeed, Defendants highlight the need for the development of factual information on this claim. In their reply memorandum in support of their motion to dismiss, Defendants assert that the Plaintiffs' attorneys know that the racial mix of cancer patients who participated in the study at issue is comparable to that of all cancer patients treated at General Hospital during the 1960 to

1972 period. *See Defendants' Reply* at 19, n. 48. Defendants' assertion is more appropriate for resolution under Rule 56 of the Federal Rules of Civil Procedure. Therefore, it is at the stage of motions for summary judgment that this Court will make a final determination as to the viability of Plaintiffs' equal protection claim.

mus on the part of the individual Defendants. In a civil rights action, pleadings are to be liberally construed and the complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Fitzke v. Shappell,* 468 F.2d 1072 (6th Cir.1972). As the Court has indicated previously, there are multiple sets of facts that if proved, would entitle Plaintiffs to relief on this claim. Only diligent discovery will reveal whether these facts exist. Of course, if facts supporting this claim do not appear, the Court is confident that the parties will present this issue at summary judgment. Accordingly, the individual and *Bivens* Defendants' motion to dismiss this claim is DENIED.

## VIII. SECTION 1985

Plaintiffs' next claim is a violation of 42 U.S.C. § 1985(3). Section 1985(3) creates a cause of action against any defendant engaged in a conspiracy to deprive a person or class of persons of equal protection of the laws, or equal privileges and immunities under the law.

■ To state a cause of action under Section 1985(3), Plaintiffs must demonstrate (1) a conspiracy; (2) for the purpose of depriving ... any person or class of persons of equal protection of the laws ...; (3) an act in furtherance of the conspiracy; and (4) an injury to either person or property or a deprivation of any right or privilege of a U.S. citizen. *See Voluntary Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 223 (6th Cir.1991), citing *United Board of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983).

■ In this case, Plaintiffs claim that the individual Defendants purposefully selected predominantly African–Americans to be the unwitting subjects of the Human Radiation Experiments. As such, Plaintiffs assert that the individual and *Bivens* Defendants, as well as the institutional Defendants, conspired to violate the equal protection rights of many of the Plaintiffs.

The individual Defendants first argue that, because the Plaintiffs seek to sue coworkers, no conspiracy among them can be established. In support of that proposition, Defendants rely upon *Hall v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505 (6th Cir.1991). In *Hall,* the Sixth Circuit Court of Appeals held that a conspiracy under Section 1985(3) could not exist because the alleged coconspirators were each members of the Board of Education that terminated the plaintiff's teaching position. *Id.* at 510. In this case, however, Plaintiffs have not alleged that the individual Defendants conspired with one another. Rather, Plaintiffs allege that the individual Defendants conspired with the so-called *Bivens* Defendants and with the City of Cincinnati. As such, the alleged conspirators are not all part of "the same collective entity," and thus, may constitute a conspiracy for purposes of Section 1985(3).[32]

Admittedly, Plaintiffs have not made any specific factual allegations of conspiracy. Nevertheless, as with their equal protection claim, the Court can conceive of several sets of facts which, if proven, would entitle Plaintiffs to relief under Section 1985(3). Consequently, the Court **DENIES** the individual and *Bivens* Defendants' motions to dismiss Plaintiffs' Section 1985(3) claim at this stage of the litigation.

## IX. PRICE–ANDERSON CLAIM

■ In paragraph 93 of their Complaint, Plaintiffs assert that pursuant to the Price–Anderson Act, 42 U.S.C. §§ 2011, *et seq.,* the Human Radiation Experiments conducted by Defendants constituted a series of "nuclear incidents" as defined in that act because such testing caused bodily injury, sickness, disease, and/or death to Plaintiffs. Accordingly, Plaintiffs assert that the Defendants are jointly and severally liable for the injuries and damages described in the Complaint caused by the nuclear incidents. The Price–Anderson Act was originally enacted in 1957 as an amendment to the Atomic Energy Act to encourage private sector investment in the development of nuclear power by limiting the

---

**32.** The Court notes that a conspiracy can be established solely upon circumstantial evidence.

*See, e.g., Addikes v. Kress,* 398 U.S. 144, 158, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

liability of private owners and operators in the event of a nuclear incident. The Price–Anderson Amendments Act of 1988 has been described as creating a federal cause of action for "public liability actions" arising from "nuclear incidents." *See Day v. NLO, Inc.*, 3 F.3d 153 (6th Cir.1993) (discussing the scope and purpose of the Amendments Act). By its terms, the Act confers federal jurisdiction over public liability actions "as defined in the Act." The relevant section of the Act, codified at 42 U.S.C. § 2014, defines "public liability action" as follows:

> (hh) The term "public liability action," as used in Section 170 [42 U.S.C. Section 2210], means any suit asserting public liability. A public liability action shall be deemed to be an action arising under Section 170, and the substantive rules for decision in such action shall be derived from the law of the state in which the nuclear incident involved occurred.

"Public liability," in turn, is defined in pertinent part as follows:

> (w) The term "public liability" means any legal liability arising out of or resulting from a nuclear incident.

Finally, the term "nuclear incident" is defined in the same section as

> (q) any occurrence, including an extra-ordinary nuclear occurrence, within the United States, causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or by-product material.

Plaintiffs assert that the allegations in the Complaint detailing that Plaintiffs suffered bodily injury, sickness, and/or death as a result of being subjected to the Human Radiation Experiments rise to the level of an occurrence as defined in the Act. Thus, Plaintiffs assert, by bringing a legal claim arising therefrom, Plaintiffs have alleged "public liability," and this action is a public liability action as defined in the Act. Accordingly, Plaintiffs assert that they have sufficiently alleged a claim under the Price–Anderson Act and sufficiently invoked the jurisdiction of this Court:

> With respect to any public liability action arising out of or resulting from a *nuclear incident*, the United States District Court in the district where the nuclear incident takes place ... shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy.

42 U.S.C. § 2210(n)(2).

A review of those cases that have examined the Price–Anderson Act since it was amended in 1988 suggests that the Act has a broad scope. For example, the Sixth Circuit Court of Appeals in *Day v. NLO, Inc., supra*, discussed the indemnification scheme of the original Price–Anderson Act, and the wholly distinct purpose of the Amendments Act, which "created a federal cause of action" for "public liability actions arising from nuclear incidents." *Id.* at 154 n. 3. The Sixth Circuit further noted that the federal courts were granted jurisdiction over such claims but that the amendment was not intended to alter the state law nature of the underlying tort claims. *Id.* Indeed, Judge Spiegel of this district noted that a plaintiff's claims under the Price–Anderson Act are "essentially state causes of action over which the federal district courts have original jurisdiction." *Day v. NLO, Inc.*, C–1–90–067. Judge Spiegel held that the plaintiffs in that case could bring all of their state law causes of action arising from a nuclear incident in federal court under the Price–Anderson Act as long as a nuclear incident also gave rise to any one of the injuries specified in 42 U.S.C. § 2014(q).

The Third Circuit Court of Appeals has indicated that the Price–Anderson Act is essentially a substantive statute that creates substantive federal rights. In *In re: TMI Litigation Cases Consolidated II*, 940 F.2d 832, 855 (3rd Cir.1991), the court noted that "Congress expressed its intention that state law provides the content of and operates as federal law" under the Price–Anderson scheme.

Accordingly, Plaintiffs assert that even if Price–Anderson were merely a jurisdictional statute, this Court would still be required to use Ohio law as the source of authority for

determining whether the elements for Plaintiffs' claims of malpractice or battery, for example, have been established. Likewise, Plaintiffs assert that the statute of limitations applicable to their state law claims must be applied by the federal forum, although questions such as accrual and tolling would be answered by application of federal, not state, law. On the other hand, the individual and *Bivens* Defendants assert that Plaintiffs have failed to state a claim under the Price–Anderson Act because the alleged conduct cannot, as a matter of law, constitute a "nuclear incident," to which the Act applies. The individual and *Bivens* Defendants assert that under the statutory definition, a "nuclear incident" requires an "occurrence." Defendants note, the term "occurrence" is not defined by the Act. However, Defendants note, all of the cases applying the Price–Anderson Act have extended potential liability only to the unintended escape or release of nuclear energy. *See, e.g., Day v. NLO, Inc.,* 3 F.3d at 153 (accidental discharge of radiation directed towards workers at Fernald plant); *Sawyer v. Commonwealth Edison Co.,* 847 F.Supp. 96 (N.D.Ill.1994) (allegation that exposure to radiation leaks at nuclear plant caused leukemia). Further, the individual and *Bivens* Defendants assert that the legislative history of the 1988 Price–Anderson Amendment demonstrates that the Act was never intended to create a federal claim for the application of nuclear medicine. Indeed, the individual Defendants point to the Senate Report, which discusses the Price–Anderson Amendments, as demonstrating that Congress was pressured to extend the boundaries of the Act to nuclear medicine, and specifically declined to do so.[33] Accordingly, the individual and *Bivens* Defendants assert that Price–Anderson was never intended to create a federal claim for the contained application of nuclear medicine, and that such use of radiation in a controlled environment is distinguishable from the Fernald and Three Mile Island occurrences typi-

cal of those that the 1988 Amendments were designed to address.

The Court agrees. Liability under Price–Anderson necessarily focuses on the operation of some nuclear facility or "source." In this case, the source was the Cobalt–60 Teletherapy Unit operated by Cincinnati General Hospital for patients involved in the cancer study, as well as other patients who received radiation treatment. While the alleged conduct of the experiments and the alleged failure to inform the subjects of the nature of the experiments may be reprehensible, the operation of the Teletherapy Unit was an application of nuclear medicine. Thus, in this case, the nuclear source at issue was employed as intended and cannot give rise to a claim under the Price–Anderson Act. Moreover, liability under the Price–Anderson Act turns on the existence of a "nuclear incident," which does not occur when there is no unintended escape or release of nuclear energy. Plaintiffs have not claimed the existence of a nuclear incident or occurrence that fits within the legislative history of the Price–Anderson scheme. For that reason, Plaintiffs' claim under the Price–Anderson Act is **DISMISSED.**

### *CONCLUSION*

For all the reasons set forth herein, the individual and *Bivens* Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part. Plaintiffs have stated claims for violations of their constitutional rights of substantive due process, procedural due process, access to the courts, and equal protection as well as a claim for a violation of 42 U.S.C. § 1985. Thus, Defendants' motions to dismiss these claims are **DENIED.** On the other hand, Plaintiffs have failed to state claims under an implied right of action and Price–Anderson Act. Therefore, Defendants' motions to dismiss these claims are **GRANTED.** Finally, as a result of this ruling, the Plaintiffs' Ohio law claims will remain pend-

**33.** *See Senate Report* 100–218, U.S.Code Cong. & Admin.News 1988, p. 1424, 1493, Section 106 (1988) (unenacted legislation extending the scope of the acts to "persons operating nuclear pharmacies or hospital medicine department"); *Indemnification of Licensees That Manufacture,* *Produce, Process, or Use Radiopharmaceuticals or Radioisotopes For Medical Purposes,* 54 Fed.Reg. 22, 444 (1989) (Termination of rule-making procedure for considering extension of Price–Anderson to nuclear medicine).

ing in this Court pursuant to its supplemental jurisdiction.

**IT IS SO ORDERED.**